In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2751

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENT MORGAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:16-cr-10031-MMM-JEH-1 — **Michael M. Mihm**, *Judge*.

ARGUED MAY 29, 2019 — DECIDED JULY 1, 2019

Before RIPPLE, ROVNER, and BARRETT, *Circuit Judges*.

ROVNER, *Circuit Judge*. The jury deciding Kent Morgan's
fate had no trouble concluding that he had possessed the 86.5
grams of methamphetamine that he conceded he tossed over
the heads of inquisitive law enforcement officers in the Peoria
airport on January 7, 2016. But the jury could not come to an
agreement as to whether the government proved that he pos-
sessed that methamphetamine with the intent to deliver it.
They declared themselves deadlocked on that issue—the one

actually charged in the indictment—but found him guilty of the lesser included offense of possession of methamphetamine. Morgan now argues that his Fifth Amendment right to be free from double jeopardy was violated by the government's second attempt to convict him of possession with intent to deliver. In the course of making that claim, he also asserts other improprieties in his trial. In the end we find only harmless errors and no violation of double jeopardy resulting after the deadlocked jury could not come to a conclusion on the indicted count. We therefore affirm the decision of the district court.

## I.

Kent Morgan has struggled with methamphetamine addiction since 2006. It was no surprise then that he would continue to feed his habit while caring for his elderly father and transitioning him from his family home in Galesburg, Illinois, to an assisted living facility nearby. During that transition, Morgan brought his father to live with him in St. George, Utah for eight months while his father's health improved. Morgan was in the process of returning his father to Galesburg when law enforcement officers stopped him at the Peoria airport and, in the course of asking him some questions, caught him throwing a medical glove, stuffed to approximately the size of a softball with 86.5 grams of pure methamphetamine, over the heads of the officers. He was arrested and charged with one count of possession with intent to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). He went to trial on that single charge on August 15, 2016.

During this first trial, Morgan chose to testify and conceded that he possessed the methamphetamine and that he

attempted to throw it to avoid arrest but denied that he intended to distribute it to anyone else. To convince the jury, he testified that he had not lived in Galesburg since 2003, he did not return often, and he knew no one in Galesburg other than his parents and an adult son who frequently travelled for his job with the railroad. As a result, he testified, all of the methamphetamine was for his personal use only. Morgan hoped to convince the jury that he was just a long-standing methamphetamine addict with a hearty appetite and tolerance for methamphetamine. His counsel followed this tack by arguing in closing that Morgan had been gone from Galesburg for years and that "there was no evidence of any kind that he even knows anybody back here." R. 131 at 32. Given Morgan's concession that he possessed the methamphetamine, the government's sole task was to convince the jury that Morgan did not simply possess the methamphetamine for his personal use, but that he intended to distribute it. It did this largely by relying on the quantity of methamphetamine that he possessed. The government's witnesses included the Drug Enforcement Administration (DEA) agent who established the chain of custody for the methamphetamine, three local police officers who were involved in the arrest, a senior forensic chemist for the DEA who confirmed the contents of the drug-stuffed glove, and a special agent with the DEA who provided background information on methamphetamine as well as expert testimony on the price, means, and manner of trafficking methamphetamine.

At the close of evidence, the court instructed the jury on the indicted charge of possession with intent to distribute. In addition, the court instructed the jury on the lesser included offense of possession of a controlled substance. The judge sent the jury to deliberate with a verdict form that gave the jury

two choices for its conclusions (The numbers are ours. The verdict forms were not numbered):

> (1) We the jury find the defendant, Kent Morgan, Guilty of the charge of Possession of Methamphetamine with Intent to Distribute as alleged in the Indictment.

> (2) We the jury find the defendant, Kent Morgan, Not Guilty of the charge of Possession of Methamphetamine with Intent to Distribute as alleged in the Indictment, but Guilty of the offense of Possession of Methamphetamine.

R. 45 at 24, 26. [1]

During the course of deliberations, the jury sent three questions out to the judge. The first of these read:

> We all agree Kent Morgan is guilty of possession of meth. However, we are not in agreement on the charge of intent to deliver. Asking for clarification, if we are not in agreement on 2nd charge, what becomes of the case? Does it become hung jury on all counts or is there a way to convict him of posession [sic] + have a non decision on 2nd charge.

R. 47 at 1.

---

[1] The jury verdict form which would have allowed the jury to find Morgan not guilty of either crime was removed from the instructions at Morgan's request once he decided to testify and concede possession. R. 131 at 6–9.

The judge conferred with counsel for both sides and all agreed that given the language of the verdict forms, there was no way for the jury to convict Morgan of possession and give no decision on the issue of possession with intent to distribute. The judge and counsel agreed to modify the verdict forms to separate guilt or acquittal on distribution from guilt or acquittal on simple possession. Morgan's counsel stated that this was "his first federal jury trial," and that he was "learning all kinds of different things." R. 127 at 195. As a result of the agreement, the judge collected the old forms and sent the jury back to deliberate with a new set of verdict forms which gave them the following four choices (once again, the numbering is ours):

> (1) We the jury find the defendant, Kent Morgan, Guilty of the charge of Possession of Methamphetamine.

> (2) We the jury find the defendant Kent Morgan, Not guilty of the charge of Possession of Methamphetamine.

> (3) We the jury find the defendant, Kent Morgan, Not Guilty of the charge of Possession of Methamphetamine with Intent to Distribute as alleged in the Indictment.

> (4) We the jury find the defendant Kent Morgan, Guilty of the charge of Possession of Methamphetamine with Intent to Distribute as alleged in the Indictment.

R. 46 at 1–4.

Shortly thereafter, the jury sent another question to the court which stated:

> We are split on the decision of the intent to de-
> liver charge. We have discussed case for a cou-
> ple hours + no one has changed their decision of
> guilty or not guilty + not likely to change. How
> much longer should we deliberate before we ar-
> rive at a hung jury? We have arrived at a deci-
> sion on the posession [sic] charge.

R. 127 at 200–01; R. 47 at 4. The judge and counsel for the par-
ties discussed the jury's second question, and the judge sug-
gested two options. He could simply tell the jury to keep de-
liberating, or, he proposed, he could bring them out and ask:
"Is there any one of the 12 of you who believes that there is
any possibility of reaching a verdict on the question of—on
the charge of possession with intent? If anyone says yes, then
I send them back in. If they all say no, then I would declare a
hung jury on the possession with intent and take the other
verdict." R. 127 at 201. Morgan's counsel asked the court to
instruct the jury to continue deliberating. The judge and both
counsel agreed that if they did not have a verdict by 4:00 p.m.,
the judge would ask: "Do you wish to continue deliberating,
or do you believe you are … hopelessly deadlocked?" R. 127
at 204–05; R. 47 at 6.

A very short while later, the judge received the following
third question:

> As in the indictment, does over posession [sic]
> 50 grams of methamphetamine determine a
> user versus a seller? Or does it reflect more into
> the sentencing of Kent Morgan.

R. 127 at 205; R. 47 at 2.

Again, the judge discussed the matter with the respective counsel, noting that he believed that "it's a big mistake if we start trying to make distinctions between using and selling beyond what they've already been told." R. 127 at 207. The court concluded that the proper response would be to re-submit the following instruction to the jury:

> In deciding your verdict, you should not consider the possible punishment for the defendant who is on trial. If you decide that the government has proved the defendant guilty beyond a reasonable doubt, then it will be my job to decide on an appropriate punishment.

R. 127 at 207; R. 47 at 3.

At 4:00 p.m., as the parties and the court had previously agreed, the judge sent the note to the jury asking whether they wished to continue deliberating or were deadlocked. The jury returned the note stating "unanimously deadlocked." R. 47 at 6.

The jury then returned a verdict of guilty of possession of methamphetamine without reaching any verdict on the charged offense of possession with intent to distribute methamphetamine. The district court did not expressly declare a "mistrial"—using that word—on the intent to distribute charge. Nevertheless, after dismissing the jury, the judge did all of the things a judge would do had he just declared a mistrial: he stated that he would schedule a sentencing hearing on the possession verdict and asked the government "[h]ow much time will you need to decide whether you're going to retry the possession with intent?" R. 127 at 213–14. The court agreed to the government's request for sixty days. In the

meantime, the court set a tentative trial date for the retrial to which Morgan's counsel agreed without further comment.

The United States Attorney eventually decided to retry Morgan for possessing methamphetamine with intent to distribute, but this time, having heard Morgan's defense that he had no contacts in Galesburg, the government came prepared to defeat it. The government subpoenaed Morgan's cell phone records and through these, prosecutors were able to track down five witnesses who were willing to testify that they had shared Morgan's methamphetamine supply with him while Morgan was visiting his father in Galesburg on previous occasions. One witness, in fact, was waiting in a car outside of the Peoria airport to give Morgan and his father a ride on the day he was arrested. Prior to trial, the government filed a notice of intent to offer these witnesses to demonstrate Morgan's intent as permitted under Federal Rule of Evidence 404(b). Morgan's counsel did not object to the motion other than to express concern that some of the prior acts were "very remote in time." R. 128 at 8. The judge dismissed this time concern but expressed his own uncertainty about the need for five witnesses. Ultimately the government agreed that it would call only three witnesses and reserve the other two for rebuttal, if necessary. Morgan's counsel had no further objections.

During a pre-trial discussion before the second trial, the parties also discussed the issue of double jeopardy. The court noted that the jury had failed to come to a verdict on the charge of possession with intent to distribute, and therefore Morgan would be tried on this count of the indictment again. The government filed a motion asking the court to prohibit reference to the prior trial. Morgan's counsel objected noting his conundrum:

> We are in a situation where if there is no prior—unless, of course, the judge is going to allow an instruction on mere possession, we're going to be stuck in a situation where the only verdict the jury has is possession with intent to deliver, and that basically cuts the trial strategy in half. … I think the jury needs to know somehow that this defendant has been convicted in this case before, but they are seeking to retry him. That's a double-edged sword because a possible implication is that he's such a bad guy that they're going to do it again.

R. 128 at 12–13. Consequently, when it became time to hash out the jury instructions, the judge asked the government to propose an instruction on the lesser included offense of possession. Morgan's counsel argued that he was entitled to either that instruction or to have the court instruct the jury that Morgan had been found guilty of possession in a prior proceeding. The court concluded:

> THE COURT: Right. I've ruled that I'm not going to do that [reference the prior proceeding], but because of that, I think that you're entitled to that instruction. But we're all aware of the fact that he's previously been convicted of that, which would normally raise double jeopardy issues. I assume for purposes of this trial you're waiving any double jeopardy issue? If he were—for example, if he's convicted only of possession in this trial, obviously he's not going to be sentenced twice.
>
> MR. HOLMAN: Right.

> THE COURT: I'd only sentence him once. But is
> that correct? Are you waiving that issue for our
> purposes here?
>
> MR. HOLMAN: Yes, Judge.

R. 133 at 5–6.

In other words, the court decided that it would present to the jury the issue of simple possession, but that the jury's finding would have no impact on Morgan. If the jury acquitted Morgan of simple possession, he would still face sentencing from the previous trial. If the jury found Morgan guilty of simple possession, the judge would not sentence him again for that conduct. [2] This allowed the jury to pick a middle ground rather than having to choose to find him guilty of the quite serious crime of intending to distribute methamphetamine or letting him off the hook entirely.

Having waived any issue of double jeopardy, the second trial advanced.[3] Part of the government's case proceeded as it had in the first trial with several law enforcement officers, DEA agents, and a forensic chemist. But the rest of the case

---

[2] We need not decide for purposes of this case the propriety of presenting an issue to the jury upon which the court has no intention to act. Experts have debated the ethics of other (and more serious) types of "sham proceedings" brought before a court. See for example, a discussion of the Greylord cases in which the government brought sham cases before the Cook County courts to ensnare dishonest judges on charges including racketeering, mail fraud, conspiracy, and extortion. See E.R. Shipp, *What's Proper In Policing The Judiciary?*, N.Y. Times, Jan. 1, 1984.

[3] Waiver is intentionally abandoning a known right. Forfeiture occurs when a party fails to make an argument because of accident or neglect. *Sansone v. Brennan*, 917 F.3d 975, 983 (7th Cir. 2019).

followed a far different path. The government offered the testimony of a law enforcement officer with training in conducting forensic examination of cell phones who testified about downloading contacts from Morgan's phone. Those contacts led the government to the three witnesses who would ultimately testify at trial about prior drug use and distribution.

Before each of those witnesses testified, the court read the jury the limiting instruction below. It was presented to the jury again when the judge instructed the jury just before deliberation. The limiting instruction stated:

> With this witness, you're going to hear testimony that the defendant committed a wrong other than the one charged in the indictment. Before using this evidence, you must decide whether it's more likely than not that the defendant committed the wrong that is not charged in the indictment. If you decide that he did, then you may consider this evidence to help you decide whether the defendant intended to distribute methamphetamine; that is, if on January 7, 2016, he possessed methamphetamine with intent to distribute. You may not consider it for any other purpose. Keep in mind that the defendant is on trial here for possessing methamphetamine with the intent to distribute on January 7, 2016, not for the other wrong.

R. 128 at 77.

The first witness, Emily Philbee, testified that she had known Morgan all of his life, and that while he was visiting Galesburg in October, 2015 through January, 2016, she

smoked methamphetamine with him approximately thirteen times, and, on a handful of occasions, she took methamphetamine from Morgan to use later. She testified that he never set a specific price for the methamphetamine that he gave her, but she knew the price and would leave money under his keyboard, buy him groceries and household goods, or provide help around Morgan's father's house. Philbee had agreed to pick Morgan and his father up from the airport on the day of Morgan's arrest.

The court reminded the jury of the limiting instruction once again before the second witness, Emily Hackwith, testified. Hackwith testified that she was in state custody awaiting charges for the state crimes of forgery and possessing methamphetamine manufacturing material. Hackwith met Morgan in September 2015, when she bought methamphetamine from him and after that helped him clean his father's attic. Hackwith ultimately testified that she smoked Morgan's methamphetamine with him three to four times a week for four months, for a total of about one hundred times. Morgan told Hackwith that he was charging $100 per gram for methamphetamine to make "money to help his mom and dad," who were elderly and infirm. R. 128 at 128.

The judge reminded the jury of the limiting instruction a third time before the testimony of Sue McIntire. McIntire's testimony echoed much of the other two. She was a childhood friend, she helped Morgan clean his parent's attic, and began using methamphetamine with him, and did so on about four occasions, with Morgan providing the methamphetamine each of those times. McIntire also testified that Morgan told

her he generally could buy the methamphetamine in Las Vegas for $500 per ounce and could sell it in Galesburg for $3,000 per ounce.

Morgan elected not to take the stand at this second trial and did not call any witnesses. During closing arguments, Morgan's counsel emphasized that the jury should focus on Morgan's intent on the day he was arrested.

> First thing I want to clear the air about is possession. Kent admits he possessed that crystal meth, that amount at the Peoria County airport. There's no doubt. He admits that it was 98 percent pure. That's a serious offense; he knows he's going to be punished big time for that, but that's what he did. The reason we're at trial today is not because he didn't—he doesn't admit that; it's because he did not have the intent to distribute that—all of that at the Peoria County airport. This case is all about the intent, possession with intent to deliver. The [government] must prove beyond a reasonable doubt that Kent possessed the ice at the Peoria County airport, and at that time—not before in Galesburg, not afterwards —but at that time he intended to deliver.

R. 133 at 39. The defense's argument was that Morgan was a serious addict who used quite a bit of methamphetamine, and that he had no intention of distributing it to anyone else. The government argued that on the day he was arrested carrying drugs, the people to whom he had recently given and sold methamphetamine were calling him on his phone. The jury deliberated for just over an hour before reaching a unanimous

verdict finding Morgan guilty of possession with intent to deliver methamphetamine.

A few weeks later, Morgan filed a pro se motion for an acquittal or new trial, arguing that his counsel had provided constitutionally ineffective assistance of counsel by failing to file a motion in limine to exclude the government's three witnesses to prior bad acts. After appointing new counsel, the court held a hearing on the motion. Morgan's initial counsel testified that he did not object to the witnesses because "Well, from the statements that I read and the research that I did, I thought that [the government's notice of intent to offer evidence pursuant to Federal Rule of Evidence 404(b)] was an appropriate motion because it was very limited to that issue of intent, and very narrowly tailored to that issue only." R. 121 at 19–20. The government argued that the prior-act witnesses presented classic evidence of intent which was exactly the focus of the trial. The court denied the post-trial motions, and ultimately sentenced Morgan to 240 months' imprisonment and ten years of supervised release.

On appeal, Morgan argues (1) that the retrial violated his Fifth Amendment right to not be placed in jeopardy for the same crime twice, (2) that the introduction of evidence of prior drug use and drug dealing violated Federal Rules of Evidence 404(b) and 403, and (3) that his counsel was ineffective for failing to raise objections based on either of these alleged errors. We address each of these concerns in turn.

## II.

### A.  Double Jeopardy

The Fifth Amendment to the Constitution states that no person shall "be subject for the same offence to be twice put

in jeopardy of life or limb." U.S. Const. amend. V. Morgan alleges that the government indicted him on one offense (one count of possession with intent to distribute), he was convicted on that indictment (although for the lesser included offense of possession) and was then retried and reconvicted on that same indictment in violation of the double jeopardy clause.

Morgan concedes that his trial counsel did not raise an objection to Morgan's retrial and assert a violation of double jeopardy, and that we must therefore review his claim under the plain error standard. To reverse for plain error, we must first find an error; the error must be plain; and third, it must affect the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732–34 (1993).

Morgan appears to object to the entire trial on double jeopardy grounds without distinguishing between the retrial on possession with intent to distribute and the retrial on simple possession. We think it more useful to evaluate his claim with a finer tooth comb—that is to look and see whether there were any violations of double jeopardy when he was retried for the possession with intent to distribute and/or when he was retried for simple possession.

We begin with some basic premises around the concept of double jeopardy. Double jeopardy protects a defendant against (1) a second prosecution for the same offense following an acquittal; (2) a second prosecution for the same offense following a conviction; and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Double jeopardy only applies, however, if there has been a resolution of the case, such as an acquittal or verdict.

> [A] trial court's declaration of a mistrial follow-
> ing a hung jury is not an event that terminates
> the original jeopardy to which petitioner was
> subjected. The Government, like the defendant,
> is entitled to resolution of the case by verdict
> from the jury, and jeopardy does not terminate
> when the jury is discharged because it is unable
> to agree.

*Richardson v. United States*, 468 U.S. 317, 326 (1984); see also *Yeager v. United States*, 557 U.S. 110, 121 (2009) (noting that a jury speaks only through its verdict and thus a hung count is not a relevant part of the record of the prior proceeding); *Green v. United States*, 355 U.S. 184, 188 (1957) ("At the same time jeopardy is not regarded as having come to an end so as to bar a second trial in those cases where unforeseeable cir-cumstances arise during the first trial making its completion impossible, such as the failure of a jury to agree on a verdict.") (internal citation omitted); *United States v. Bailin*, 977 F.2d 270, 280 (7th Cir. 1992) (explaining that a hung jury does not trig-ger issue preclusion, and "[t]he powerful double jeopardy protections that attach to acquitted counts should not be out-weighed by the inconclusiveness inherent in hung counts.").

In this case, we have an additional layer to consider. The jury deadlocked and came to no conclusion on the indicted charge of "possession of methamphetamine with intent to dis-tribute," but was able to come to a verdict of guilty on the lesser included offense of possession. In addition to the Su-preme Court holding that "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause," (*Richardson*, 468 U.S. at 324), there are two other key Supreme Court hold-ings that guide our consideration. First, if the jury convicts on

the lesser included offense and acquits on the greater offense, the defendant cannot be tried again on the greater offense. "Historically, courts have treated greater and lesser-included offenses as the same offense for double jeopardy purposes, so a conviction on one normally precludes a later trial on the other." *Currier v. Virginia*, 138 S. Ct. 2144, 2150 (2018); See also *Jeffers v. United States*, 432 U.S. 137, 150–51 (1977); *Brown*, 432 U.S. at 168–69. Second, if the jury convicts on the lesser included offense and is *silent* on the greater offense, then a court will construe that silence as an acquittal and the defendant cannot be retried on the greater offense. *Green*, 355 U.S. at 191 ("we believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree.'"); *Price v. Georgia*, 398 U.S. 323, 329 (1970) ("this Court has consistently refused to rule that jeopardy for an offense continues after an acquittal, whether that acquittal is express or implied by a conviction on a lesser included offense when the jury was given a full opportunity to return a verdict on the greater charge.").

Because an offense and its lesser included offense are the same offense for double jeopardy purposes, it is clear that Morgan could not have been convicted and sentenced for both possession and possession with intent to distribute methamphetamine. See *Rutledge v. United States*, 517 U.S. 292, 297 (1996); *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Consequently, giving the jury verdict forms that would have allowed the jury to find Morgan guilty of both crimes was an error and started a snowball of confusion that grew as it rolled downhill.

The confusion was compounded because the jury dead-
locked on the charge of possession with intent to deliver
methamphetamine. This was not a conviction, an acquittal, or
an acquittal by implication on the charge of possession with
intent to distribute. We cannot say what the jury thought
about Morgan's intent to distribute, and ordinarily, the gov-
ernment is entitled to one full and fair conclusion with a ver-
dict of guilt or not. *Richardson*, 468 U.S. at 326. It is clear that
if the jury had acquitted or been silent, the government could
not have retried Morgan for possession with intent to distrib-
ute. The jury, however, clearly stated on the record that it was
deadlocked and could not come to a conclusion on the distri-
bution charge. Because the jury was deadlocked and not silent
on the greater charge, Morgan's reliance on cases like *Green v.
United States*, *Price v. Georgia*, and *Brown v. Ohio* is misplaced.
In *Green* and *Price*, the jury was silent (as opposed to expressly
deadlocked, as is the case here) as to the indicted charge, and
thus the courts interpreted the silence as an implicit acquittal.
*Green*, 355 U.S. at 191; *Price*, 398 U.S. at 324. As we noted, it is
unequivocally true that a defendant may not be re-tried after
an acquittal, either implicit or expressed. *Green*, 355 U.S. at
191; *Price*, 398 U.S. at 329. And in *Brown*, the Court held that
the government could not hold a second trial for a greater of-
fense after it has already prosecuted a defendant for the lesser
included offense. *Brown*, 432 U.S. at 169–70. But the facts in
*Brown* did not include an earlier mistrial, and ordinarily "a
retrial following a 'hung jury' does not violate the Double
Jeopardy Clause." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109
(2003) (citing *Richardson,* 468 U.S. 317 at 324). Our circuit has
held that cases barring retrial for greater and lesser included

offenses, "do not apply to retrials after mistrials because mistrials do not terminate the original jeopardy." *United States v. Bailin*, 977 F.2d 270, 275 (7th Cir. 1992).

In this situation, the district court could have either declared a mistrial and allowed the government to retry the whole case, or accepted the guilty plea of possession and ended the prosecution of Morgan's crimes. Instead it struck a legally erroneous middle ground—accepting a guilty verdict on the lesser included offense of possession and allowing retrial on the greater offense of possession with intent to distribute. This error created the confusing tension between the rule that states that conviction on a lesser included offense normally precludes a later trial on the greater offense, on the one hand, and the rule that states that double jeopardy does not preclude retrial after a hung jury, on the other. The Supreme Court's current state of flux about issue preclusion in criminal cases, adds to these muddied waters. See *Currier*, 138 S. Ct. at 2149–50 & *Id.*, 138 S. Ct. at 2158–60 (Ginsburg, J. dissenting) (majority and dissent struggling with *Ashe v. Swenson*, 397 U.S. 436 (1970), and issue preclusion in the criminal context). Luckily we need not wade into these murky areas of double jeopardy and issue preclusion. Thankfully, the very case that stirs up the muck, has given us a bridge to resolve this case without wading into it. *Id.*[4]

In *Currier*, a divided court struggled with the question of whether issue preclusion applies in criminal cases and how issue preclusion intersects with concepts of double jeopardy. *Id.* at 2149–50, 2157–63. A majority of the court could not agree on the issue preclusion question, which is not, in any event,

---

[4] Curiously, neither party pointed us to this case.

relevant in Morgan's case. What the *Currier* court did make inarguably clear, however, is that once a defendant consents to a second trial, he no longer may object to the retrial on double jeopardy grounds. *Currier*, 138 S. Ct. at 2151. "[T]he Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice" to participate in a retrial. *Id.* (citing *United States v. Scott*, 437 U.S. 82, 99 (1978)); see also *Jeffers*, 432 U.S. at 152.

Moreover, the defendant's consent to a new trial need not be explicit. An implicit agreement to a second trial "is enough to foreclose any double jeopardy complaint about it." *Currier*, 138 S. Ct. at 2151. In other words, consent to a new trial, implicit or otherwise, forecloses any later objection to double jeopardy. And this waiver or forfeiture of a double jeopardy defense need not be "knowing, voluntary, and intelligent." *Id.* (citing *United States v. Dinitz*, 424 U.S. 600, 609 n.11 (1976) (collecting cases)). Double jeopardy, therefore, is a defense that can be forfeited by silence—that is, if it is not affirmatively raised before or at trial. *United States v. Parker*, 368 F.3d 963, 969 (7th Cir. 2004); *United States v. Wilson*, 962 F.2d 621, 626 (7th Cir. 1992); *United States v. Buonomo*, 441 F.2d 922, 924 (7th Cir. 1971). And, consequently, it can be waived by counsel. *Dinitz*, 424 U.S. at 609 n.11.

The Supreme Court has held that some choices, like the choice to plead guilty, waive the right to a jury, testify in one's own behalf, or take an appeal can only be waived by the defendant himself. *Florida v. Nixon*, 543 U.S. 175, 187 (2004). The court has never expanded on these four rights that require the defendant's personal waiver. And if that were not evidence

enough, the court in *Dinitz*, specifically declared that the defendant's claim that a waiver of double jeopardy must be knowing, intelligent, and voluntary "erroneously treats the defendant's interest in going forward before the first jury as a constitutional right comparable to the right to counsel." *Dinitz*, 424 U.S. at 609 n.11. See also *Currier*, 138 S. Ct. at 2151 (2018) (noting that the Supreme Court has "expressly rejected the contention that the permissibility of a retrial depends on a knowing, voluntary, and intelligent waiver" of a double jeopardy defense when a second trial is the result of that defendant's voluntary choices); *Escobar v. O'Leary*, 943 F.2d 711, 715 n.2 (7th Cir. 1991) ("[a] defendant can forfeit double jeopardy rights without making a knowing, voluntary, and intelligent waiver of those rights.")

As the Supreme Court explained:

> What suffices for waiver depends on the nature of the right at issue. Whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake. For certain fundamental rights, the defendant must personally make an informed waiver. For other rights, however, waiver may be effected by action of counsel. Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has-and must have-full authority to manage the conduct of the trial. As to many decisions pertaining to the conduct of the

> trial, the defendant is deemed bound by the acts
> of his lawyer-agent and is considered to have
> notice of all facts, notice of which can be charged
> upon the attorney. … Absent a demonstration
> of ineffectiveness, counsel's word on such mat-
> ters is the last.

*New York v. Hill*, 528 U.S. 110, 114–15 (2000) (internal citations omitted). This assumption protects defendants in a complex legal system where decisions and arguments often must be made quickly or lost. As the Supreme Court explained,

> Numerous choices affecting conduct of the trial,
> including the objections to make, the witnesses
> to call, and the arguments to advance, depend
> not only upon what is permissible under the
> rules of evidence and procedure but also upon
> tactical considerations of the moment and the
> larger strategic plan for the trial. … In most in-
> stances the attorney will have a better under-
> standing of the procedural choices than the cli-
> ent; or at least the law should so assume.

*Gonzalez v. United States*, 553 U.S. 242, 249–50 (2008). For this reason, a lawyer is not required to "obtain the defendant's consent to 'every tactical decision.'" *Nixon*, 543 U.S. at 187 (citing *Taylor v. Illinois,* 484 U.S. 400, 417–18 (1988)).

Morgan's counsel did not object when, after the jury dead-locked on the charged offense at the first trial, the court asked the government how long it would need to decide on a retrial. Morgan's counsel did not object when the court scheduled the retrial. Morgan's counsel did not object at the start of the sec-

ond trial or at any time therein.[5] "[A] defendant's consent dispels any specter of double jeopardy abuse that holding two trials might otherwise present. This Court's teachings are consistent and plain: the 'Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice.'" *Currier*, 138 S. Ct. at 2151 (citing *Scott*, 437 U.S. at 99). Morgan's consent "dispels any specter of double jeopardy abuse that holding the two trials might otherwise present." *Id.*

There is one small wrinkle to consider about the retrial on possession with intent to distribute. Ordinarily when a jury cannot reach a verdict, the district court will declare a mistrial on that particular charge, thus formally releasing the prosecution to retry the defendant. In this case the district court never declared a "mistrial" using that particular word. The government argues, and we agree, that it would be error to conclude that there was no mistrial simply because the district court failed to use that exact term. See, e.g., *United States v. Powers*, 978 F.2d 354, 359 (7th Cir. 1992) ("the trial judge when

---

[5] Morgan makes one feeble argument to demonstrate that mistrial due to a hung jury was not the result of his voluntary choice. He argues that although his counsel acquiesced to the judge's timeline of giving the jury until 4:00 p.m. to reach a verdict before accepting the deadlock, he did so "out of respect of the district court and not a desire to conclude the proceedings." Reply Brief at 5. The court and counsel for both sides had an extensive conversation about how long the court should require the deadlocked jury to deliberate. After the judge suggested that he allow the jury to deliberate until 4:00 p.m., Morgan's counsel stated on the record, "that's fine." R. 127 at 203. A lawyer cannot acquiesce to a court's suggested course of action and then claim later that "I did not mean it and was only saying it to be polite." The dangers of accepting such an argument are too obvious to elaborate upon.

declaring a mistrial did not use the words 'manifest necessity,' but they are neither magic nor necessary when sufficient justification appears in the record."). The record was replete with evidence that the judge and both parties considered the proceedings to have ended in a mistrial. The judge announced that the jury was deadlocked, dismissed the jury, and gave the government sixty days to make a decision about retrying Morgan.

The next question, then, is whether the court could retry Morgan for the lesser included offense of possession of methamphetamine for which he was convicted at the first trial. It could not. This clearly would constitute a second prosecution for the same offense, and one for which the jury came to a resolution—a clear violation of double jeopardy. *Brown*, 432 U.S. at 165 ("The Double Jeopardy Clause … protects against a second prosecution for the same offense after conviction."). Morgan's counsel, however, clearly and unequivocally waived this right to be free from double jeopardy. At the beginning of the second trial, the district court judge and Morgan's counsel had the following exchange:

> THE COURT: … we're all aware of the fact that he's previously been convicted of that [possession], which would normally raise double jeopardy issues. I assume for purposes of this trial you're waiving any double jeopardy issue?
>
> If he were—for example, if he's convicted only of possession in this trial, obviously he's not going to be sentenced twice.
>
> MR. HOLMAN: Right.

> THE COURT: I'd only sentence him once. But is that correct? Are you waiving that issue for our purposes here?
>
> MR. HOLMAN: Yes, Judge.

R. 133 at 5–6.

As we explained above, a defendant who explicitly or implicitly consents to a second trial of an offense is foreclosed from making any complaint about double jeopardy. See *Currier*, 138 S. Ct. at 2151. Morgan made a voluntary choice to have the judge in the second trial instruct the jury on the lesser included offense of possession. He cannot now use the Double Jeopardy clause to forestall that prosecution. See *Id.* at 2151 (plurality) & 2157 (Kennedy, J., concurring) ("The end result is that when a defendant's voluntary choices lead to a second prosecution he cannot later use the Double Jeopardy Clause, whether thought of as protecting against multiple trials or the relitigation of issues, to forestall that second prosecution.").

And just as Morgan's lawyer could waive or forfeit the right to a double jeopardy defense against retrial for the greater charged offense, Morgan's lawyer could also waive his double jeopardy rights related to retrial of the lesser included offense. *Currier*, 138 S. Ct. at 2151; *Dintz*, 424 U.S. at 609 n.11. Morgan's very situation illustrates why allowing a lawyer to waive double jeopardy defenses as a tactical matter makes sense. The news has been replete with stories about the ravages of the methamphetamine epidemic and the lives ruined and lost. A jury, given the choice between letting a possible methamphetamine dealer go scot free or convicting him of possession with intent to deliver, might be inclined to do

the latter. But, given the chance to reach a middle ground and find him guilty of possession alone, a jury faced with a low-level dealer trying to make money for his elderly, ailing parents, might feel more comfortable finding him guilty of possession alone. This was the strategy that Morgan's counsel chose when he asked for either an instruction that Morgan had already been found guilty of possession or to present the place-holding lesser included offense option to the jury. As Morgan's trial counsel argued to the judge, "we're going to be stuck in a situation where the only verdict the jury has is possession with intent to deliver, and that basically cuts the trial strategy in half. … I think the jury needs to know somehow that this defendant has been convicted in this case before, but they are seeking to retry him." R. 128 at 12–13.

In sum, Morgan has either forfeited or waived any claims that he had that his rights under the double jeopardy clause have been violated.

## B. Propensity evidence

Moving from procedure to substance, Morgan alleges that the use of the three "other act" witnesses who testified about his prior drug use and drug dealing violated Federal Rule of Evidence 404(b) and 403, as their testimony was used to demonstrate his propensity to deal drugs and thus unfairly prejudiced his case. He did not raise this issue below (other than to contest that the prior acts were too remote in time—an issue he does not contest here) and therefore we once again review this claim for plain error only. *United States v. Thomas*, 897 F.3d 807, 812 (7th Cir.), *cert. denied*, 139 S. Ct. 615 (2018), and *cert. denied*, 139 S. Ct. 850 (2019).

*1. Rule 404(b) and propensity evidence*

At issue here is the testimony of government witnesses Emily Philbee, Melissa Hackwith, and Sue McIntire, all of whom frequently exchanged text messages with Morgan in the few months prior to his arrest, including on the day of his arrest. Each witness testified that she had both used methamphetamine with, and received it from Morgan. On its face, Rule 404(b) prohibits evidence of wrongs or acts that are not the ones for which a defendant is on trial.

The relevant parts of Rule 404(b) are as follows:

> **(b) Crimes, Wrongs, or Other Acts.**
>
> **(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> **(2) Permitted Uses; … .** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. …

Fed. R. Evid. 404(b). A more colloquial way to state the rule might be to say that a court may not allow in evidence of prior acts to show that the defendant is "the kind of person who would do such a thing."

The problem, as we have frequently acknowledged, is that often evidence can be used for both a permitted use—such as showing intent—and also an impermissible use, such as propensity. *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir.

2014). For this reason, our court has concluded that "the district court should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *Id.* at 856 (emphasis in original).

The government could have introduced the other-act evidence described by the witnesses for impermissible propensity purposes. In this case, however, Morgan conceded that he possessed the methamphetamine, but contested that he intended to distribute it to others. Evidence of his intent, therefore, was clearly relevant for the non-propensity purpose of proving the required intent.

### 2. *Rule 403: balancing probative value and prejudice*

Our evaluation of non-propensity relevance under Rule 404(b) is just the first step. "[E]ven if the other-act evidence is relevant without relying on a propensity inference, it may be excluded under Rule 403." *Id.* at 856–57. Rule 403 of the Federal Rules of Evidence allows a court to exclude even relevant evidence if "its probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. Courts must tread carefully before admitting other act evidence because it almost always creates "some risk that the jury will draw the forbidden propensity inference." *Gomez*, 763 F.3d at 857. And of all the 404(b) permissible uses, "intent" is perhaps the one most likely to be tangled up with improper propensity uses. *Id.* at 858.

How then must a court attempt to balance this difficult question when other act evidence is both relevant for a permissible use—for example, to demonstrate intent—but also

may be used prejudicially by a jury to assume that a defendant has a certain propensity to commit a crime? The Court in *Gomez* instructed that "the degree to which the non-propensity issue actually is disputed in the case will affect the probative value of the other-act evidence." *Id.* at 857.

Intent can become a disputed or contested issue in one of two ways. First, intent is almost always an important issue in a specific intent crime, but it can also become a hotly contested issue if the defendant makes it so in a case involving a general-intent crime. *Id* at 858–59. Our Circuit holds that possession with intent to distribute is a specific intent crime. *United States v. Lopez*, 907 F.3d 537, 543 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1612 (2019); *United States v. Chapman*, 765 F.3d 720, 727 (7th Cir. 2014); *United States v. Miller*, 673 F.3d 688, 697 (7th Cir. 2012). And even if it were not, Morgan placed it plainly at issue both in his opening statement, and his closing argument at the second trial.[6]

In opening arguments in the second trial, his counsel said very little (a mere 152 words), but what he did say placed intent front and center: "[T]he key thing that you need to keep in mind is, what is his intent? Okay? He's carrying it, yes. He's stopped at the airport, yes. But did he intend to sell all of those drugs anywhere?" R. 132 at 13. At closing, he reiterated,

> [Morgan] did not have the intent to distribute
> that—all of that at the Peoria County Airport.

---

[6] The government argues that Morgan also placed intent squarely at issue by raising it in his first trial and taking the stand to concede that he possessed the methamphetamine but deny that he intended to distribute it. Appellee's Brief at 40. We do not think that Morgan placed his intent at issue in the second trial simply because he raised it in the first trial.

> This case is all about intent, possession with intent to deliver. The [government] must prove beyond a reasonable doubt that Kent possessed the ice at the Peoria County Airport, and at that time—not before in Galesburg, not afterwards—but at that time, he intended to deliver.

R. 133 at 39.

Juxtaposing this case with *United States v. Chapman*, 765 F.3d 720 (7th Cir. 2014), demonstrates the importance, when balancing prejudice and probative value, of considering "the extent to which the non-propensity factual proposition actually is contested in the case." *Gomez*, 763 F.3d at 857. In *Chapman*, police officers claimed that they had seen the defendant, Chapman, carrying a bag with the butt of a gun sticking out. They later stopped and arrested Chapman as he was climbing out of a nearby window without the bag. The recovered bag, it turned out, contained a very large quantity of heroin. Chapman conceded that the bag contained a distribution-level quantity of heroin. His defense was simply that the bag was not his—that is, he never possessed it. *Id.* at 724. In that case, we held that the evidence of Chapman's prior heroin convictions was relevant only through an inference about propensity—because he had sold heroin before, he must have intended to do so again. *Id.* at 726. The court concluded that "even if the government had articulated a theory of relevance that does not rely on an impermissible propensity inference (and it did not), the probative value of the heroin-trafficking conviction is substantially outweighed by the risk of unfair prejudice in the specific context of this case. Chapman's defense rested entirely on his claim that he never possessed the bag *at all*." *Id.* at 726–27 (emphasis in original).

In other words, Chapman disputed possession but conceded intent (that is, that whoever possessed the heroin intended to distribute it). The evidence of his prior heroin sales, therefore, had almost no probative value free from an impermissible propensity inference. In contrast, Morgan disputed intent but conceded possession, therefore the probative value of the evidence of intent was high. The government's introduction of the three 404(b) witnesses in this case was thus a legitimate response to the sole issue in the case—whether Morgan intended to distribute the methamphetamine that he admitted to possessing. The high probative value outweighed any risk of unfair prejudice.

### 3. *Jury instructions and prejudice*

The risk of unfair prejudice can also be reduced by giving the jury limiting instructions aimed at preventing the use of the other act evidence for improper purposes. *Gomez*, 763 F.3d at 860. The judge in this case issued such limiting instructions before each of the 404(b) witnesses testified, and again to the jury at the close of evidence. The jury instructions varied from the Seventh Circuit's pattern jury instructions. We compare them side by side below with the substantive differences in italics. We also include the government's proposed instruction as it will become relevant in our discussion:

| Government's proposed instruction 13. | Instruction 13 given to jury | Pattern instruction |
|---|---|---|
| You have heard testimony that the defendant committed a wrong other than the one charged in the | You have heard testimony that the defendant committed a wrong other than the one charged in | You have heard [testimony/evidence] that the defendant committed acts other than the ones |

indictment. Before using this evidence, you must decide whether it is more likely than not that the defendant did the wrongs that are not charged in the indictment. If you decide that he did, then you may consider this evidence to help you decide *that* on January 7, 2016, *he possessed methamphetamine with intent to distribute.* You may not consider it for any other purpose. Keep in mind that the defendant is on trial here for possessing methamphetamine with the intent to distribute on January 7, 2016, not for the other wrong. R. 74-1 at 15.

the indictment. Before using this evidence, you must decide whether it is more likely than not that the defendant did the wrongs that are not charged in the indictment. If you decide that he did, then you may consider this evidence to help you decide *if* on January 7, 2016, *the defendant intended to distribute some or all of the methamphetamine he is accused of possessing.* You may not consider it for any other purpose. Keep in mind that the defendant is on trial here for possessing methamphetamine with the intent to distribute on January 7, 2016, not for the other wrong. R. 77 at 11. See also R. 128 at 75-76, 116; R. 129 at 144; R. 133 at 57.

charged in the indictment. Before using this evidence, you must decide whether it is more likely than not that the defendant took the actions that are not charged in the indictment. If you decide that he did, then you may consider that evidence to help you decide [describe with particularity the purpose for which other act evidence was admitted, e.g. the defendant's intent to distribute narcotics, absence of mistake in dealing with the alleged victim, etc.]. You may not consider this evidence for any other purpose. *To be more specific, you may not assume that, because the defendant committed an act in the past, he is more likely to have committed the crime[s] charged in the indictment.* The reason is that the defendant is not on trial for these

| | | other acts. Rather, he is on trial for [list charges alleged in the indictment]. *The government has the burden to prove beyond a reasonable doubt the elements of the crime[s] charged in the indictment. This burden cannot be met with an inference that the defendant is a person whose past acts suggest bad character or a willingness or tendency to commit crimes.* |
| | | Pattern Criminal Jury Instructions of the Seventh Circuit (2012 Ed.) (plus 2015-2017 and 2018 changes), §3.11. |

Although our court urges district courts to begin with the Seventh Circuit's pattern jury instructions, it is only the starting point and the court instructs that instructions "should be customized to the case rather than boilerplate." *Gomez*, 763 F.3d at 860.

In this case, we are troubled by what was omitted from the instructions. The instructions ordered the jury not to consider the testimony of the 404(b) witnesses "for any other purpose."

But would a lay person on a jury, who would have no reason to know how or why our judicial system struggles with propensity evidence, have any idea what the court means by "for any other purpose?" What it actually means is that the jury should not use the evidence to infer that the defendant is a "bad guy" or the "type of guy who would sell methamphetamine or commit crimes in general." These are the exact explanations that were excluded from the pattern instructions. Without them it almost makes it seem as though the jury *may* use the evidence for propensity purposes. In other words, how was a jury to know that it could not use the other act evidence to show "Morgan has sold methamphetamine in the past therefore he must be guilty of doing it this time." We think the omissions from the pattern instructions created an error.

Not only do we think that it was in error, but it seems as though the district court judge did too. When he first considered the proposed jury instruction he stated,

> I looked at your proposed jury instructions [on propensity evidence] … but it doesn't accurately state the instruction. It does in part. But your jury instruction does not tell them what the specific reason, motive, intent, design or whatever that its being offered.

> The way I read your instruction, it just sounds like—almost like a propensity instruction which, of course, is not permitted.

> I assume you intended to fill in there with whether the defendant intended to distribute methamphetamine; is that right? His intent?

R. 128 at 9. In response, the government agreed to "tighten" the instruction. *Id.* But the only change it made was not substantive and certainly did not address the judge's prior concern about propensity. The government changed "you may consider this evidence to help you decide that on January 7, 2016, the defendant possessed methamphetamine with intent to distribute," to "you may consider this evidence to help you decide if on January 7, 2016, the defendant intended to distribute some or all of the methamphetamine he is accused of possessing." Compare R. 74-1 at 15 (Government's proposed instruction) to R. 77 at 11 (instruction submitted to jury).[7]

Nevertheless, Morgan's counsel affirmatively agreed to this instruction, not just once, but twice. R. 128 at 75–76; R. 133 at 4. First, during a pretrial proceeding as the judge and counsel were reviewing jury instructions and limiting instructions. The judge read the instruction and then asked, "Are we all agreed that that would be the proper instruction?" R. 128 at 76. Morgan's counsel responded, "Yes, Judge." *Id.* And then, again, when reviewing the instructions just before submitting them to the jury, the judge suggested that the word "that" should be changed to "if." He then stated, "Any objection to that as amended?" R. 133 at 4. Morgan's counsel replied "No, Judge." *Id.* Thus any objection was unequivocally waived. When a defendant negligently fails to object to a jury instruction before the jury retires to deliberate, the defendant may later attack that instruction only for plain error. *United States v. Natale*, 719 F.3d 719, 729 (7th Cir. 2013). A defendant who waives—rather than forfeits—his objection as Morgan did

---

[7] The Judge also changed the word "that" to "if." See R. 133 at 4 and compare R. 74-1 at 15 to R. 77 at 11.

here however, "cannot avail himself of even the demanding plain error standard of review. He has no recourse and generally must live with his earlier decision not to press the error." *Id.*

We note for future trials that we think a jury instruction that does not inform the jury what "other purposes" means is not sufficient to explain forbidden propensity purposes to jurors. Our court has explained the import of including the rationale in the propensity instruction.

> [W]e see no reason to keep the jury in the dark about the rationale for the rule against propensity inferences. Lay people are capable of understanding the foundational principle in our system of justice that we try cases, rather than persons. The court's limiting instruction would be more effective if it told the jurors that they must not use the other-act evidence to infer that the defendant has a certain character and acted "in character" in the present case because it does not follow from the defendant's past acts that he committed the particular crime charged in the case. Finally, the instruction would be improved by tying the limiting principle to the prosecution's burden of proof. The jurors should be reminded that the government's duty is to prove beyond a reasonable doubt every element of the *specific crime* charged, and it cannot discharge its burden by inviting an inference that the defendant is a person whose past acts suggest a willingness or propensity to commit crimes.

*Gomez*, 763 F.3d at 86. The government's proposed jury instructions and the one used at trial omitted this rationale. Jury instructions on propensity should include the rationale explained in *Gomez* and in the pattern instructions. Morgan, however, twice waived his right to object to the instructions as submitted.

## C. Ineffective assistance of counsel

Finally, Morgan asks us to evaluate his claim of ineffective assistance of counsel. His brief, in a footnote, recognizes that "in some cases, this Court has suggested that ineffective assistance of counsel claims are more appropriately reserved for proceedings under 28 U.S.C. § 2255." Appellant's Brief at 44, n.8. We have done more than suggest; we have warned against the near-certain folly that will arise, not just in "some cases" but in nearly every situation in which ineffectiveness of counsel claims are reviewed on direct appeal. We have counseled that such claims of ineffective assistance of counsel are "'invariably doomed' on direct review because they often require augmentation of the record with extrinsic evidence, which cannot be considered." *Delatorre v. United States*, 847 F.3d 837, 844 (7th Cir. 2017) (citing *United States v. Gilliam*, 255 F.3d 428, 437 (7th Cir. 2001)). And we have even noted in one opinion that as of that date, this Court had never reversed a conviction on direct appeal because of ineffective assistance of counsel. *See United States v. Trevino*, 60 F.3d 333, 339 (7th Cir. 1995). We have documented our concerns and warnings again and again. *See United States v. Harris*, 394 F.3d 543, 557 (7th Cir. 2005) (compiling cases with warnings against pursuing ineffective assistance claims during direct appeal). See also *Massaro v. United States*, 538 U.S. 500, 506 (2003).

It is true that in this case there was indeed some factual development that would be helpful for an ineffective assistance claim. After the second trial, Morgan filed a pro se motion for an acquittal or, in the alternative, a new trial. After the district court appointed a new attorney, his trial counsel submitted an affidavit and testified at a subsequent hearing on the motion. R. 101-1; R. 121. Morgan's brief alleges that this is a sufficient record with which to proceed with respect to the ineffectiveness of Morgan's first trial counsel. We disagree. There is no record at all in the post-trial hearing of counsel's strategy regarding double jeopardy. And his strategy regarding the 404(b) witnesses is only addressed in a limited manner. Furthermore, Morgan agrees that the record is not sufficiently developed to assess the effectiveness of his second lawyer, who took over during the post-trial motions, and asks to preserve any claim Morgan raises as to his second lawyer's performance for collateral review. We would then be placed in a position of assessing ineffectiveness of counsel in a piecemeal fashion, which, for judicial economy, we decline to do. See *West v. Louisville Gas & Elec. Co.*, 920 F.3d 499, 503 (7th Cir. 2019) ("permitting multiple, piecemeal appeals from a single action in the district court will have a debilitating effect on the efficient administration of justice.").

Moreover, if we were to consider Morgan's claim here, our decision will be binding on the district court on post-conviction review and Morgan will have lost the opportunity for a true full review of the matter. *Harris*, 394 F.3d at 558. Consequently, we decline to review Morgan's claim of ineffective assistance of counsel in this direct appeal. See, e.g., *United States v. Stork*, 487 F. App'x 295, 296 (7th Cir. 2012).

The judgment of the district court is AFFIRMED in all respects.